## In re Trust of Bailey and Regar

216

*Boyd Lee Spahr*, for accountant.
*Alfred R. Haig*, contra.

STEARNE, J., auditing judge, December 3, 1936.—This trust arose under a declaration of trust dated May 9, 1923, made by The Land Title and Trust Company, now the accountant. By the terms thereof the trustee acknowledges having received in cash from William H. Bailey and N. K. Regar the sum of $9,000, or $4,500 from each, with the declared intention that said sum should be invested by the trustee "in good interest-bearing securities, which may be readily converted into cash for prompt distribution when payments are required to be made hereunder". It was provided that the trustee's commission should be at the rate of two percent on principal and income, and that the trust should terminate when and as certain income tax liability, as therein particularly set forth, should be ascertained and assessed or definitely

found to be not due. By separate writing, which is annexed to the declaration of trust, the two settlors consent to the terms and conditions of the trust. The original declaration of trust was submitted and has been returned to counsel.

The reason or purpose of the filing of the account is that the trust has terminated, the Collector of Internal Revenue having stated, by letter dated October 9, 1933, that no additional taxes were due for the fiscal years stated in the declaration of trust by either of the settlors, individually or trading as Crown Dyeing and Finishing Company. Also, by letter dated May 20, 1936, signed by the two settlors, addressed to the trustee, they expressly revoke the trust, and demand an equal division and payment to them in cash of the principal and all accumulated income thereon, less payments theretofore made to them by way of distribution. It is admitted by all parties in interest that the trust has ended, and I am requested to so find. William H. Bailey and N. K. Regar, settlors, are living and sui juris, and they are now entitled to principal and accrued income in equal shares. Awards will be made accordingly.

Before going into a discussion of the material question involved in this accounting I wish to direct the attention of counsel to a matter of procedure which requires correction in order that our records may be in proper form. The account before me is captioned: In the Matter of the Trust of Crown Dyeing and Finishing Company under Deed of Trust dated May 9th, 1923". The account was advertised under that caption and so appeared on the regular audit list. Strictly speaking, the account should have been captioned under the names of the individual settlors, William H. Bailey and N. K. Regar, and advertised as such. As I understand the facts, Crown Dyeing and Finishing Company, the fictitious name under which settlors traded as partners, ceased to do business and was dissolved prior to the date of execution of the trust instrument. At least, the partnership firm as such does not

appear to be a party to the trust agreement. The declaration of trust is executed by the trustee, and is consented to by the two settlors in their individual capacities. The caption on the account and other papers filed of record should read: "In the Matter of the Trust of William H. Bailey and N. K. Regar, under Declaration of Trust by Land Title Bank and Trust Company, formerly The Real Estate-Land Title and Trust Company, successor to The Land Title and Trust Company, Trustee, dated May 9, 1923." The clerk of the court is accordingly directed to correct the docket and other records as indicated.

The Act of June 26, 1931, P. L. 1384, amending the Orphans' Court Act of June 7, 1917, P. L. 363, which gave the orphans' court jurisdiction in these matters, specified: "(n) The control, removal, discharge, and settlement of accounts of trustees of trusts inter vivos"; Rule of Court 22, adopted September 30, 1931, directed that all the provisions of the acts of assembly and the rules of court relative to testamentary trusts should be construed as in the nature of rules of court regulating trusts and trustees inter vivos, so far as the same are applicable. According to the New Century Dictionary, vol. 3, p. 2451, the term "inter vivos" is a Latin expression meaning "between living persons." Whether or not the wording of the act as quoted is broad enough to include trusts set up by other than individuals, i. e., corporations, partnership firms, trade associations, etc., is not involved in this case. The present trust is by and between "living persons", and this should be made to appear on our records. The fact that the declaration of trust is executed by the corporate trustee is of little moment. It is consented to by the settlors as individuals, and it was they who instituted the trust.

The two settlors now demand payment in cash of $9,000 principal and all accumulated income thereon, less payments heretofore made to them in distribution. Whether they are entitled to a return of cash, or must accept in kind the securities in which their cash was invested, is

the question I am called upon to adjudicate. The account shows the assets of the trust to consist of four assets. The first of these, $9,000 bonds of Garden Court Apartments, represents the original principal fund, whereas the other three are investments made from accumulated income transferred to principal from time to time for the purpose. The Garden Court Apartment bonds are first mortgage bonds purchased from and guaranteed by the Philadelphia Company for Guaranteeing Mortgages, paying six percent and due September 15, 1932. They are carried in the account at $8,910, or 99 for each 100, but the uncontradicted testimony is that they now have a current market value of "somewhere between 12 and 15". Thus, on a reappraisement of this asset, it would be marked down to at best $1,350.

From the testimony of William H. Barwig, assistant trust officer of the Land Title Bank & Trust Company, it appears that the investment in Garden Court Apartment bonds was made in May 1923. The account shows the investment under date of May 18, 1923, about nine days after the trust had its inception. The bonds were purchased from the Philadelphia Company for Guaranteeing Mortgages and were part of a total issue of $900,000 made on September 15, 1922, maturing September 15, 1932. The property upon which the issue was secured was appraised at that time by H. LeRoy Webb, an employe of the trustee, at $1,500,000. In March 1925 the issue was refinanced and new bonds placed on the property in the total amount of $1,100,000, and the property was reappraised at $2,000,000 by the same H. LeRoy Webb. The reason for the refinancing was that the owners discovered it was necessary to raise additional cash for the erection of the building. Taxes and interest on the property and the mortgage were paid up to date at the time of the investment and continued to be so for several interest periods thereafter. The bondsman on the original issue was one I. Clarence Pennington, admittedly a straw man in the transaction. He was likewise the

bondsman on the reissue in 1925. At the time of the second issue in 1925 the bonds held by the trustee in this trust were surrendered, and a bonus of one percent was paid to the trustee. This bonus, $90, is accounted for and appears on page 1 of the account. The principal and interest of both issues was guaranteed by the Philadelphia Company for Guaranteeing Mortgages. The first default on these bonds occurred in March 1933, when interest was not paid, and from that time to the present interest and principal remain unpaid.

It is agreed that when interest began to accumulate the trustee communicated with counsel for settlors and suggested reinvestment of income, which was agreed to. As a result certain transfers were made from income to principal on the dates and in the amounts as shown by the account, and under date of March 1, 1926, an investment of $1,000 was made in a bond secured by a first mortgage on premises 2617 Hunting Park Avenue, Philadelphia. This bond was also purchased from and guaranteed by the Philadelphia Company for Guaranteeing Mortgages. As to this investment the testimony shows the total issue of bonds was $75,000 on February 17, 1926, maturing February 17, 1929. Upon maturity the mortgage was extended to February 17, 1932, and apparently subsequently extended to February 17, 1939. Under date of April 4, 1925, the property upon which the issue of bonds was secured was appraised at $148,200 by one W. W. Smith, admittedly an employe of the trustee. Interest and taxes were paid up to date at the time of the purchase. The real estate taxes have been paid to 1936, inclusive, and interest has been paid to February 17, 1936. The interest due August 17th is available and will be turned over to the new trustee or trustees as soon as qualified to receive the same, after which distribution will be made to the bondholders. The Philadelphia Company for Guaranteeing Mortgages was the trustee of this bond issue, but, because of the fact that that company is now in receivership and is being liquidated, a new trustee of the

bond issue is required. It was testified that such a new trustee has been appointed, but has not as yet qualified.

The account further shows an investment under date of January 15, 1930, of $2,500 share in an omnibus mortgage. This is a share in a first mortgage secured on a property at 2815 Overbrook Terrace, Merion Golf Manor, Haverford. The mortgagee is the Real Estate-Land Title & Trust Company, trustee for sundry trusts. The mortgage is dated January 14, 1930, and matured January 14, 1933. The total mortgage was $18,000, and the property upon which it is secured was appraised by one C. W. Haskill at $30,000. This participation was purchased one day after the mortgage was issued, and the taxes on the property were paid up to date of settlement. The mortgage has been reduced by payments on account to $16,775, and the investment of this trust in this mortgage is now $2,334 instead of the original $2,500. At the present time the interest on the mortgage has been paid up to date, the real estate taxes are paid to 1935, inclusive, and all of the local township and county taxes for 1936 are paid in full. One third of the 1936 school tax is paid, and the balance, due in instalments, is not yet payable. The property is in Haverford Township, Delaware County, Pa.

The account also shows an investment out of accumulated income of $1,000 interest in an omnibus mortgage, under date of July 26, 1931. This mortgage was secured on premises southeast corner of Forty-second Street and Woodland Avenue, Philadelphia, and the mortgagee was the Real Estate-Land Title & Trust Company, trustee for sundry trusts. The original amount of the mortgage was $125,000 and was dated April 25, 1923, maturing April 25, 1928. The original mortgagor was one Arthur I. Fink, admittedly a straw man in the transaction. The investment in this trust was purchased from the estate of Herman P. Cramer, deceased, of which the Land Title Bank & Trust Company was and is trustee. The property upon which the mortgage was secured was appraised under date of November 7, 1930, at $187,625 by one Sam-

uel C. Kane. The interest due April 25, 1931, was paid at the time of purchase and there was at that time no default in the taxes. Principal of the mortgage was reduced by payments on account to $108,000, and this trust received $104 of that, leaving $896 as its principal investment. The mortgage went into default as to nonpayment of 1935 taxes and was foreclosed. The property is now owned as real estate, and the interest of this trust therein is 896/108000ths, carried in the account as a value of $955.80. The taxes for 1935 and 1936 were paid at the time settlement was made with the sheriff. There is no testimony as to whether the property is rented or not, and it is apparently producing no income.

The account shows that, in addition to the foregoing, various other investments were made out of income from time to time, but were paid off. The four investments mentioned above now constitute the corpus of the trust.

It will be noted that the first two investments above noted were first mortgage bonds purchased from the Philadelphia Company for Guaranteeing Mortgages, and were guaranteed by that company as to principal and interest. It was testified that the Philadelphia Company at all times created an active market in its own securities, and bought them back at 99 and interest up to about one year before it went into receivership, which occurred on January 11, 1933. It appears, therefore, that up to the end of 1931 there was a real market for the bonds at 99. Under its guaranty the company reserved the right to have bondholders wait 18 months for collection of their principal when due. The company had never previously called on or invoked this "18 months' clause" in their contract, but on December 15, 1931, did so abruptly without notice to its bondholders. Thereafter the ready market ceased to exist, and today the bonds are salable for speculation purposes only at between 12 and 15.

Cross-examination of accountant's witness brought out the fact that relations between the Land Title & Trust Company and the Philadelphia Company for Guarantee-

ing Mortgages were intimate to a certain extent. The trust company never had any financial interest in the mortgage company and never owned a share of its stock, but they did have interlocking directorates. The trust company took a large number of investments in many estates directly from the mortgage guarantee company and, except in a few cases, these securities were never resold to anybody but the Philadelphia Company for Guaranteeing Mortgages. One of the complaints of the settlors is that the trustee purchased securities for the trust which on resale could only be disposed of through one outlet. This, they contend, is not an investment in "good interest-bearing securities, which may be readily converted into cash for prompt distribution, etc.", as the trust instrument provided.

Another complaint of settlors is that the original investment in Garden Court Apartment bonds was made more than a month prior to the passage of the Act of June 29, 1923, P. L. 955, which made bonds of this character legal investments for trust funds. Prior to the passage of the act it was debatable whether or not such securities were in fact legal investments. I find no merit in this contention. On March 15, 1925, long after the act became effective, the bonds purchased in 1923 were surrendered and new bonds, secured on a new mortgage in a different amount after a reappraisement, were taken in exchange and a cash bonus paid. I have no hesitancy in finding that the first mortgage guaranteed bonds of the Philadelphia Company for Guaranteeing Mortgages were technically legal investments as far as this trust is concerned.

Whether or not the Garden Court Apartment bonds were good interest-bearing securities, readily convertible into cash for prompt distribution, is the real question involved. While the trustee, in its declaration of trust, bound itself to such investments only, yet at no place in the trust instrument do I find a promise to guarantee investments and return cash to the settlors. I refuse to

find that the trustee was an insurer of the fund placed in its hands for investment. Nothing in the declaration of trust could possibly be construed as having such effect. As to the propriety of the investment, I cannot and will not permit hindsight to be substituted for foresight in measuring the trustee's responsibility. Concerning the purchase of the bonds in question, it was testified, and not denied, that in every instance there was an appraisement made of the real estate upon which the bonds were secured. The adequacy of the value fixed by the appraisements was not assailed. It is to be observed that the principal and interest of the bonds were guaranteed by what was then regarded by all investors as a sound and reliable company. At the time the investments were made the mortgage company stood ready to redeem them at 99 percent of their face values, and this ready and favorable market continued for a period of over eight years after the investments were made, or until the collapse of the mortgage company. I do not regard the fact that there was no general market for these bonds as having any effect upon the question. Quite naturally there would be no general market for bonds of this type, where the company issuing them stood ready, willing, and able to redeem them at one point under par.

In 1923 and for some years thereafter the Philadelphia Company for Guaranteeing Mortgages was by far the largest company of its kind in this vicinity, and always bore an enviable reputation for financial stability. During the several years of prosperity following the inception of the trust income was paid promptly and allowed to accumulate for reinvestment without complaint or objection on the part of settlors. Periodical statements were rendered by the trustee to settlors and they must have known of what the corpus consisted. Undoubtedly the bonds in question were what might be called "good interest-bearing securities", and I find this to be the fact.

I attach little importance to the testimony concerning the intimacy which existed between the trustee and the

mortgage guaranty company. True, the appraisers of the properties upon which the bonds were secured were employes of the trust company, but the appraisements they made were not attacked and it must be assumed they were fair. In no case did the total issue of bonds exceed 60 percent of the appraisal. It was shown that the bondsman in each case was a straw person in the employ of the trust company. This carries little weight, as it is common knowledge this was the custom in bond issues of such character. Purchasers of guaranteed mortgage bonds relied for security, not on the financial responsibility of the bondsman, but rather on the company's guaranty and the value in the real estate. It might be inferred that because of the intimacy which existed between the trustee and the mortgage company the trustee should have known or, at least, suspected that the so-called "18 months' clause" in the contract was about to be invoked, and that the market for the bonds was about to be lost. However, the logic of this is unsound. If the trustee did have such knowledge, and there is nothing in the record to show that it did, in order to play fair with the large number of trust estates under its charge it would of necessity have been compelled to attempt to immediately liquidate all Philadelphia Company bonds which it held as trustee, the inevitable result of which would have been to destroy the very market it was interested in preserving. It is to be borne in mind that the only evidence of intimacy between the two companies is that they had interlocking directorates. In the absence of evidence other than this it must be assumed that each was separate and distinct from the other, and one cannot be charged with knowledge or even suspicion of insolvency of the other.

At the time the investment in the bonds was made and for a period of some eight years thereafter the same were readily convertible into cash at slightly under par, the price at which they were purchased. The declaration of trust limits the trustee to investment in securities which "may be readily converted into cash". This does not neces-

sarily mean the investments must be such as could be converted into cash equivalent to the original investment. To so hold would, in effect, make the trustee an insurer of the fund, and I can find no warrant for this in the instrument. The bonds in question can, at this time, be converted into cash. True, at a greatly reduced figure, but, nevertheless, they are convertible even now. The uncontradicted testimony shows there is a current market for the bonds at between 12 and 15. I accordingly find that the original investment in first mortgage guaranteed bonds was an investment in "good interest-bearing securities" which could be "readily converted into cash for prompt distribution".

All of what has been written above applies with equal force to the investment of income in bonds secured on 2617 Hunting Park Avenue, Philadelphia. With respect to this issue of bonds the testimony shows that the mortgage underlying them is not now in default, principal not being due until February 17, 1939, and taxes and interest having been paid to date. Certainly it has not been shown that this was an improvident investment. Because the guaranty of the Philadelphia Company has been lost it does not necessarily follow that the asset has been lost or impaired. I refuse to penalize the trustee for any lack of judgment in purchasing this asset.

I likewise have no fault to find with the investment in the omnibus mortgage on 2815 Overbrook Terrace, Merion Golf Manor, Haverford. The investment was in a mortgage just being issued and amply secured. While the mortgage, in a reduced amount, is now in default as to principal, yet the current taxes and interest are paid. I decline to attach any importance to the fact that accountant was mortgagee in the transaction, and, in effect, purchased one of its own securities for the trust. A trust company cannot be criticized for lending trust funds on mortgage, taking the mortgage in its name as trustee for sundry trusts, and dividing the mortgage in shares among various trust estates in its charge. This is a common

practice and has always been approved by the courts. If the mortgage itself was amply secured by sufficient value in the real estate, then it necessarily follows that each participation therein must likewise be amply secured. I can find nothing to criticize in this investment.

As to the investment in the omnibus mortgage on the property at Forty-second Street and Woodland Avenue, Philadelphia, the testimony likewise shows that at the time the investment was made on July 26, 1931, there was no indication that it was not adequately secured. In November 1930 the property was appraised at $187,625 by an appraiser who had no connection with the trustee. The mortgage secured thereon was $125,000, or approximately two thirds of the appraised value. The mortgage was subsequently reduced to $108,000, went into default, and was foreclosed. The trust now owns an interest in the real estate. Since it has not been shown that the investment at its inception was bad, or at least insecure, I must refuse to surcharge or order a substitution of cash therefor.

It is to be observed at this point that the last three mentioned investments were made from an accumulation of income by and with the consent, either expressed or implied, of settlors. Nothing in the trust instrument obliges the trustee to reinvest income, and, in doing so, it cannot be said the trustee is bound by the restriction therein contained which was originally intended to apply to investments of principal only. There is nothing in the record to indicate that the trustee agreed to invest accumulated income in "good interest-bearing securities, which may be readily converted into cash". On this ground alone the trustee would be relieved from responsibility with respect to investment of income other than such responsibility as ordinarily attaches to trustees not limited as to exercise of judgment.

No higher degree of knowledge, skill, diligence and caution is required of a corporate trustee than is expected of a prudent business man. I dare say there are many

prudent business men now holding guaranteed mortgage bonds of the Philadelphia Company for Guaranteeing Mortgages, same having been purchased at a time when such bonds were considered conservative investments. The law requires of a trustee only common skill, common prudence and common caution: Dauler's Estate, 247 Pa. 356; Detre's Estate, 273 Pa. 341; Dempster's Estate, 308 Pa. 153; and many other cases too numerous to mention. The trustee in this instance conformed to this standard of conduct. Counsel for settlors, in his brief, cites and quotes from Brooke's Estate, 321 Pa. 529; Dickinson's Estate, 21 D. & C. 247, affirmed in 318 Pa. 561; and Kelch's Estate, 318 Pa. 296. I have studied them, and I am particularly familiar with Kelch's Estate, but, except for outlining the general scope of a trustee's authority in dealing with investments, they are of little help, the facts in each case being divergent. Dickinson's Estate and Kelch's Estate dealt with retention of nonlegal securities, and Brooke's Estate had to do with whether or not certain mortgage bonds were legal investments.

In surcharge cases, as in cases involving construction of wills, precedents are of little value in arriving at a conclusion. Rules of construction cannot be made hard and fast, for the reason that in one case a given rule would work equity and justice, whereas in another case involving a slightly different set of facts the same rule would spell injustice and hardship. Likewise, in cases such as the present, if trustees were limited and restricted by rules which were unbending there would be no room for imagination and judgment, and the administration of a trust estate would be reduced to a mathematical formula. Each case must, of necessity, be decided on its own merits after careful consideration of the proven facts, and after giving due credit to such precedents as are in point or reasonably close.

I have been unable to find any case, and none has been cited, which would serve as a guide in the present controversy. I do know that in certain cases, chief among

which is Crick's Estate, 315 Pa. 581, trustees have been held not liable to return cash unless such a stipulation is contained in the instrument creating the trust. I am certain in this case that the trustee did not so stipulate in its declaration. I find, as a matter of fact, that the trustee acted with due diligence and care, and that the investments made were prudent and proper under all the circumstances. Accordingly I decline to direct a substitution of cash, and I refuse to surcharge because of such finding. If settlors decline or refuse to accept the securities in their present form, accountant is directed to sell them forthwith and distribute the proceeds. Awards will be made accordingly.

And now, December 3, 1936, the account is confirmed nisi.